### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| BARBARA D. COLEMAN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Docket no. 2:15-cv-00097-GZS |
| | ) | |
| BIO-MEDICAL APPLICATIONS OF | ) | |
| MAINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

### ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is the motion for summary judgment filed by Defendant Bio-Medical Applications of Maine, Inc. ("BMA") (ECF No. 18) (the "Motion for Summary Judgment"). For the reasons explained herein, the Court DENIES the Motion for Summary Judgment.


## I.      LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law."

Nereida–Gonzalez v. Tirado–Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 56(e).  "Mere allegations, or conjecture unsupported in the record, are insufficient."  Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera–Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation." (citations omitted)).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

## II.    FACTUAL BACKGROUND

For the purposes of this Order, the Court briefly summarizes the facts as set forth in the statement of material facts provided by Defendant Bio-Medical Applications of Maine, Inc. ("BMA" or "Defendant") (ECF No. 18-1) ("DSMF") and the statement of material facts provided by Plaintiff Barbara Coleman ("Coleman" or "Plaintiff") (ECF No. 21) ("PSMF").  The Court notes that each party has filed objections and qualifications to the other party's statement of material facts.  (Def.'s Reply to Pl.'s Statement of Material Facts (ECF No. 24); Pl.'s Opp. to Def.'s Statement of Material Facts (ECF No. 22).)  Where appropriate, certain disputed issues of material fact are identified below.

### A.    Coleman's Employment at BMA and Medical Leave

Coleman, then a nurse employed by BMA at BMA's dialysis clinic in Portland, Maine, commenced a medical leave of absence on September 13, 2013.  (DSMF ¶ 1.)  On October 31, 2013, Coleman provided BMA with a certification of ability to return to work, signed by her physician, stating that Coleman would be able to return to work as of November 7, 2013 (the "First RTW Note").  (DSMF ¶ 3.)  The First RTW Note contained four work restrictions, which were described in the note as having "no end date": (1) a maximum of 30-32 hours of work per week; (2) work shifts of no more than 8 hours; (3) no lifting greater than 75 pounds; and (4) appropriate meal and restroom breaks.  (DSMF ¶¶ 4 & 5; PSMF ¶ 17.)

Coleman asserts that on November 1, 2013, she was notified by BMA's leave management office that her return to work with restrictions had been denied by Lisa Drouin ("Drouin"), the clinic manager of the BMA facility at which Coleman was employed and Coleman's supervisor at the time she began her leave of absence.[1]  (PSMF ¶ 20.)  Drouin stated in an e-mail message to

---

[1] BMA denies that BMA or Drouin denied Coleman's request for accommodations or rejected her return to work. (Def.'s Reply to Pl.'s Statement of Material Facts (ECF No. 24) ¶ 20.)

colleagues on November 1, 2013, "[W]e felt in the best interest of the employee and our clinic deny [Coleman's] return to work with the restrictions."  (PSMF ¶ 19.)  The same day, Martha D'Sanchez ("D'Sanchez"), employee relations manager for BMA, stated in an e-mail reply to Drouin, "The Americans with Disabilities Act is [sic] amended (Federal Law) requires that we engage in an interactive dialogue with individuals protected by the same, before we simply decline to make accommodations."  (PSMF ¶ 21.)

### B.      The Return-to-Work Interactive Process

BMA's leave management office requested that Coleman obtain additional paperwork from her physician clarifying certain of Coleman's work restrictions.  (PSMF ¶ 22.)  Consequently, Coleman consulted her physician, who provided another return to work letter (the "Second RTW Note").  (PSMF ¶ 33.)  The Second RTW Note repeated the restrictions included in the First RTW Note, stated that Coleman's restrictions were permanent, and clarified that the break requirements consist of a 30-minute meal break within the first four hours of a shift, a 15-minute rest break in the latter four hours of a shift, and a restroom break once every two hours.  (DSMF ¶ 20.)  BMA received the Second RTW Note on November 21, 2013.  (DSMF ¶ 19.)

During the time that Coleman's return-to-work process was ongoing, BMA transferred the management of its employee leave matters to a third-party service provider, AON Hewitt.  (PSMF ¶ 32.)  On November 22, 2013, Coleman twice called AON Hewitt to discuss the status of her leave and return to work.  (PSMF ¶¶ 35 & 36.)  In the case of each call, Coleman was not able to speak with her case manager at AON Hewitt.  (Id.)  On November 25, 2013, D'Sanchez spoke with Drouin and told her that Coleman could be returned to work with the restrictions set forth in the Second RTW Note.  (DSMF ¶ 21.)

On November 26, 2013, Drouin called Coleman.  Drouin and Coleman have differing recollections of their discussion.  Drouin recalls that she informed Coleman that she would be able to return to work with the accommodations listed in the Second RTW Note, that she and Coleman agreed that they would meet in person on December 3, 2013, and that Coleman would then work a shift on that date.  (DSMF ¶¶ 22 & 23.)  In contrast, Coleman recalls that Drouin told her that she would be allowed to return to work on a trial basis and with certain conditions, and that a meeting would need to take place before Coleman could resume working.  (PSMF ¶¶ 45-47.) Coleman further asserts that Drouin promised to send her an e-mail setting forth in writing the conditions of her return to work, the proposed terms of Coleman's "trial basis" employment, and information concerning the proposed meeting.  (PSMF ¶ 47.)

On November 26, following her conversation with Drouin, Coleman received a call back from her case manager at AON Hewitt, Kristopher Scory ("Scory").  (DSMF ¶ 24.)  Scory indicated to Coleman that AON Hewitt did not have all of the paperwork required for the review of her leave.  (PSMF ¶ 51.)  Coleman subsequently called AON Hewitt on November 27 and December 2 to further discuss with Scory the status of her case, but in each instance she was not able to speak to Scory.  (PSMF ¶¶ 53 & 55.)  During the call on December 2, another AON Hewitt representative informed Coleman that AON Hewitt was not in possession of any information from BMA regarding Coleman's return to work or an agreement by BMA to accommodate the restrictions in the Second RTW Note.  (PSMF ¶ 56.)

Drouin sent Coleman an e-mail on December 3, stating that "you [Coleman] were suppossed [sic] to start work today" and requesting that Coleman contact her to "let me know what is going on and when we can plan on you returning to work."  (DSMF ¶ 36; Coleman Dep., Ex. 4 (ECF No. 14-3) at PageID # 150.)  Coleman did not reply to this e-mail message.  Drouin called

AON Hewitt on December 3 and December 4 in an attempt to speak with Scory, but was not able to speak with him on either occasion.  (PSMF ¶¶ 58 & 60.)  D'Sanchez then called AON Hewitt on December 6 and spoke with a representative.  (PSMF ¶ 61.)  The representative told D'Sanchez that Coleman "doesn't have the proper paperwork" and that "[Coleman's] been waiting for the case manager to call her back."  (PSMF ¶ 63.)  On December 11, Scory and D'Sanchez spoke about Coleman's case.  (PSMF ¶ 68.) Scory mistakenly told D'Sanchez that Coleman had returned to work on October 30, 2013, and D'Sanchez corrected Scory.  (PSMF ¶¶ 68 & 69.)  D'Sanchez decided to personally oversee Coleman's return-to-work process and asked Scory to close Coleman's file.  (PSMF ¶ 77.)

D'Sanchez sent a letter to Coleman, dated December 11, 2013, stating that Coleman was expected back at work on December 3 but that Coleman had not reported for work.  (DSMF ¶ 39.) The letter stated that Coleman had been absent from work without authorization for nine days. (PSMF ¶ 80.)  The letter further stated that Coleman had five days to contact BMA's leave office or Drouin in order to coordinate her return to work.  (DSMF ¶ 39.)  The letter also stated that Coleman's failure to timely respond would be "considered job abandonment and will result in voluntary termination of your employment . . . ."  (PSMF ¶ 81.)  The letter was received by Coleman on December 18, 2013.  (PSMF ¶ 84.)

Coleman sent a letter to Drouin, dated December 16, 2013, describing various of Coleman's concerns and her objections to the process by which her return to work had been handled by BMA and AON Hewitt.  (PSMF ¶¶ 86-91.)  This letter referenced Coleman's consultation with an attorney.  (PSMF ¶ 92.)  On December 17, Coleman sent an e-mail to D'Sanchez, Drouin, and other employees of BMA, stating that she was "no longer an employee" and asking that her "employee status and date of separation" be updated.  (DSMF ¶ 41.)

6

Drouin provided a copy of the letter dated December 16, 2013 to D'Sanchez on December 18, and D'Sanchez replied to Drouin by e-mail that "given that [Coleman] states she's engaged an attorney, I'll need to escalate this to our internal counsel . . . ."  (PSMF ¶ 92.)  Coleman asserts that she mailed another letter, dated December 20, 2013, to Drouin and D'Sanchez, which further stated Coleman's concerns and criticisms regarding the handling of her return-to-work process. (PSMF ¶ 93.)   In the letter, Coleman insisted that all correspondence regarding employment accommodations should be handled in writing.[2]  (Id.)

On December 19, 2013, D'Sanchez e-mailed Coleman to inform her that D'Sanchez had received Coleman's letter dated December 16 and her e-mail transmitted on December 17.  (DSMF ¶ 48.)  D'Sanchez asked Coleman to clarify whether she had intended to resign or whether she intended to return to work.  (Id.)  D'Sanchez sent a further e-mail to Coleman on December 27, requesting that Coleman respond by January 3, 2014, and stating that failure to respond would result in Coleman's separation from employment with BMA.  (DSMF ¶ 49.)  Coleman responded on January 3, stating that she had directed correspondence to D'Sanchez by certified mail.  (DSMF ¶ 50; PSMF ¶ 94.)  D'Sanchez replied to the e-mail the same day, proposing that Coleman and D'Sanchez verbally discuss Coleman's status and potential return to work.  (DSMF ¶ 51; PSMF ¶ 95.)

On January 8, 2014, D'Sanchez sent a further e-mail to Coleman, informing her that BMA had concluded, based on the lack of a further response, that Coleman had voluntarily resigned, with her termination of employment effective as of January 8, 2014.  (DSMF ¶ 54.)  On January 27, 2014, D'Sanchez e-mailed Coleman and stated that she had received the certified letter dated January 3, 2014.  (DSMF ¶ 56.)  In this letter, Coleman described what she asserted were failures

---

[2] BMA maintains that neither Drouin nor D'Sanchez received this letter until Coleman e-mailed a copy of such letter to D'Sanchez on February 6, 2014.  (DSMF ¶ 57.)

by Drouin relating to Coleman's medical leave and return-to-work process.  (Coleman Dep., Ex. 4 (ECF No. 14-3) at PageID # 171-172.)  The letter also included a description of Coleman's recollection of the phone conversation between Coleman and Drouin on November 26, 2013.  (Id. at 172-173.)

### C.     The Present Dispute

On January 29, 2015, Coleman filed a complaint against BMA in Cumberland County Superior Court (the "Complaint"), advancing one count of retaliation in violation of the Maine Human Rights Act (the "MHRA") and one count of disability discrimination in violation of the MHRA.  (Complaint (ECF No. 3-3) at PageID # 20-21.)  Defendant then removed the case to this Court.  (Notice of Removal (ECF No. 1) at PageID # 1.)  Defendant filed the present Motion for Summary Judgment on November 13, 2015.

## III.   DISCUSSION

A claim for retaliation under the MHRA requires that a plaintiff "show that she engaged in statutorily protected activity; her employer made an employment decision that adversely affected her; and that there was a causal link between the protected activity and the adverse employment action."  Doyle v. Dept't of Human Servs., 824 A.2d 48, 56 (Me. 2003) (internal quotation omitted).[3]  "Once the plaintiff has made a prima facie showing of retaliation . . . defendant must articulate a legitimate, non-retaliatory reason for its employment decision.  If the defendant meets this burden, the plaintiff must . . . show that the proffered legitimate reason is in fact a pretext and

---

[3] The elements and application of both the retaliation claim and the disability discrimination claim closely parallel the elements of the analogous causes of action permitted under the Americans with Disabilities Act.  See Dudley v. Hannaford Bros. Co., 190 F. Supp. 2d 69, 73 (D. Me. 2002), aff'd 333 F.3d 299 (1st Cir. 2003) ("Courts have interpreted the ADA and MHRA statutes as coextensive.")  The Supreme Judicial Court of Maine has stated that "[o]ur construction of the MHRA . . . has been guided by federal law . . . ."  Currie v. Indus. Sec., Inc., 915 A.2d 400, 404 (Me. 2007).

that the job action was the result of the defendant's retaliatory animus." <u>Calero-Cerezo v. U.S.</u> <u>Dept. of Justice</u>, 355 F.3d 6, 26 (1st Cir. 2004).  In the Motion for Summary Judgment, BMA does not dispute that Coleman engaged in the statutorily protected activity of requesting accommodations for a claimed disability.  (Mot. Summ. J. (ECF No. 18) at PageID # 688.)  Rather, BMA argues that it did not make an employment decision that adversely affected Coleman, and that even if it did, Coleman's protected activity was not causally linked to any such decision.

A claim for disability discrimination under the MHRA requires that a plaintiff show that "first, she suffers from a disability; second, she is otherwise qualified, with or without reasonable accommodations, and is able to perform the essential functions of the job; and third, she was adversely treated by the employer based in whole or in part on her disability." <u>Doyle</u>, 824 A.2d at 54.  Where, as here, a plaintiff's claim is based on an employer's failure to provide reasonable accommodations, adverse treatment can be shown where "the employer despite knowing of the employee's alleged disability, did not reasonably accommodate it." <u>Sensing v. Outback</u>, 575 F.3d 145, 157 (1st Cir. 2009) (internal quotation omitted); <u>see also</u> <u>Equal Emp't Opportunity Comm'n</u> <u>v. Kohl's Dep't Stores, Inc.</u>, 774 F.3d 127, 131 (1st Cir. 2014).  In the Motion for Summary Judgment, BMA does not dispute that Coleman suffered from a disability or that she was qualified and able, with reasonable accommodations, to perform the essential functions of her job.  Rather, BMA contends that Coleman was not adversely treated by BMA because BMA fulfilled its legal obligations in connection with the reasonable accommodation of Coleman's disability.

Both of Plaintiff's claims are impacted by the interactive process between BMA and Coleman to address the disability-related accommodations Coleman requested.  Where an employer is aware of an employee's disability and the employee has requested an accommodation, that request "may trigger a duty on the part of the employer to engage in an interactive process."

<u>Enica v. Principi</u>, 544 F.3d 328, 338 (1st Cir. 2008).  Defendant asserts that Plaintiff failed to participate in good faith in the interactive process, and thus Plaintiff was responsible for the breakdown of that process.  Responsibility for a breakdown in the interactive process is not necessarily attributed to one party or the other.  Rather, "Where a breakdown in the process has been identified, 'courts should look for signs of failure to participate in good faith . . . .'"  <u>Id.</u> at 339 (quoting <u>Beck v. Univ. of Wis. Bd. of Regents</u>, 75 F.3d 1130, 1135 (7th Cir. 1996)).  Viewing the entire record in the light most favorable to Plaintiff, disputes remain over genuine issues of material fact relating to the interactive process and Defendant's good faith during that process. Given these remaining issues of fact, the precedent cases upon which Defendant relies in the Motion for Summary Judgment do not support a grant of summary judgment in favor of Defendant on either Plaintiff's retaliation claim or Plaintiff's disability discrimination claim.

### A.      Retaliation

Defendant argues that Plaintiff has failed to make a prima facie factual showing of either an adverse employment action or, if an adverse employment action did occur, a causal relationship between Plaintiff's protected activity (requesting accommodations for an asserted disability) and such adverse employment action.  However, genuine issues remain in dispute as to material facts pertaining to both of these prongs of the retaliation claim.

Plaintiff argues that she was subject to the adverse employment action of having her employment at BMA terminated.  Defendant denies that it took such an action, and counters that the record demonstrates that Plaintiff voluntarily resigned her position at BMA.  Defendant characterizes written communications sent by Plaintiff to personnel at BMA as an acknowledgement that Plaintiff had resigned as of December 17, 2013.  (Mot. Summ. J. (ECF No. 18) at PageID # 689.)  However, the same communications might also be interpreted to reflect a

view by Plaintiff that her employment had been terminated by Defendant, or that the interactive process had so irreparably broken down that she assumed she would not be able to return to her prior position.  Plaintiff has stated that she believed her employment had been terminated by Defendant as of December 17, 2013.  (PSMF, ¶ 85.)  The parties' competing interpretations of the correspondence between Plaintiff and Defendant's employees give rise to a trialworthy issue of fact that may not be resolved in the context of this Motion for Summary Judgment.

Defendant cites a recent decision from the District of New Hampshire, Gallagher v. Unitil Service Corp., 2015 WL 5521794 (D.N.H. 2015), to support its interpretation of the record as clear that Plaintiff voluntarily resigned from her position at BMA.  In Gallagher, the plaintiff submitted a straightforward letter of resignation and participated in an exit interview in which she described her thought process in deciding to resign.  Id. at *7.  As discussed above, however, the record before this Court is not clear as to whether Plaintiff resigned, and Plaintiff maintains that she did not intentionally resign from her position.  Therefore, this Court cannot conclude that, as a matter of law, no reasonable jury could find that Plaintiff was subject to an adverse action by BMA.

Defendant's argument on the causation prong fares no better.  Both Plaintiff and Defendant agree, in broad terms, that Plaintiff's employment came to an end following the breakdown of an interactive process that did not include the required good faith participation of employer and employee.  However, the parties disagree on which of them was principally to blame for the breakdown of the process.  Defendant argues that Plaintiff failed to participate in the process by failing to meet with Drouin on December 3, 2013 (according to Defendant, the first day that Plaintiff was due to return to work), allegedly resigning on December 17, 2013, and failing to respond to e-mail messages subsequently sent by D'Sanchez, culminating in D'Sanchez's e-mails on January 3 and January 8, 2014.  (Mot. Summ. J. (ECF No. 18) at PageID # 691-692.)  Plaintiff

contends that it was the delay, obstruction, conflicting messages, and unfulfilled promises of Defendant's employees and agents, ranging from an alleged summary denial of Plaintiff's requested accommodations on November 1, 2013 to Drouin's alleged failure to provide written information regarding accommodations and work schedule prior to December 3, 2013, that caused the interactive process to fail.  (Pl.'s Mem. Law Opp. Def.'s Mot. Summ. J. (ECF No. 20) at PageID # 744-745.)

Defendant argues that, like in <u>Soileau v. Guilford of Me., Inc.</u>, 105 F.3d 12 (1st Cir. 1997), Plaintiff has failed to make an adequate showing on  the causation element of the retaliation claim because the "larger sequence of events" demonstrates that there was no causal relationship between Plaintiff's request for accommodations and any adverse employment action.  <u>See</u> <u>id.</u> at 16. However, the comparison is inapt.  In <u>Soileau</u>, the plaintiff had been repeatedly disciplined and warned of his potential discharge prior to the defendant being informed of the plaintiff's alleged disability.  <u>Id.</u> at 16-17.  In fact, the plaintiff's claimed disability was a psychological condition that the plaintiff's doctor believed was triggered by stress from receiving employment-related discipline and repeated warnings from the defendant.  <u>Id.</u> at 14.  On the record before the court in <u>Soileau</u>, the course of discipline and failure of the employee to undertake remedial and planning measures that led to his termination "could not have been motivated, even in part, by a request for an accommodation."  <u>Id.</u> at 17.

In the present case, the record does not unambiguously support a view of Plaintiff's termination as the independent result of a sequence of events occurring in parallel with Plaintiff's health problems and requested accommodations.  To the contrary, both parties agree that Plaintiff's termination followed and resulted from a defective interactive process undertaken to address Plaintiff's accommodation requests.  Since Plaintiff has provided a plausible evidentiary basis for

concluding that Defendant caused a breakdown in the interactive process, the question of causation, like the question of whether an adverse employment action occurred, remains for the ultimate factfinder to resolve.

Plaintiff has made a prima facie showing that her evidence, if credited by the jury, could support the conclusion that Plaintiff's request for accommodations was causally related, via a delayed and obstructed interactive process, to the eventual termination of her employment.  See Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008) ("[A] party that obstructs or delays the interactive process is not acting in good faith.") (internal quotation omitted).  Defendant appears to argue in its reply brief that it has demonstrated, through the record, that, even if Plaintiff's employment was terminated by Defendant, it has rebutted Plaintiff's prima facie case by identifying a legitimate, non-discriminatory reason for that termination, while Plaintiff has failed to present an adequate showing of retaliatory animus.[4]  See Calero-Cerezo, 355 F.3d at 26. According to Defendant, Plaintiff's asserted facts raise, at most, the perception that "BMA ineptly handled and bungled [Plaintiff's] return to work."  (Def.'s Reply Mem. Supp. Mot. Summ. J. (ECF No. 23) at PageID # 796.)

Defendant understates Plaintiff's causation argument.  Plaintiff has made a colorable argument that a jury, viewing the entire record in the light most favorable to Plaintiff, could reasonably conclude that Defendant's employees used the interactive process as pretext for frustrating Plaintiff's return to work.  Given the competing assessments of the facts that can be supported by this record, reserving judgment for the jury on Plaintiff's retaliation claim is

---

[4] Defendant argues that Plaintiff has not made a prima facie showing of retaliation.  It is not clear that Defendant has appropriately briefed the argument that, even if the burden shifted to Defendant to provide a legitimate, non-discriminatory reason for Plaintiff's termination of employment, summary judgment is still appropriate because Defendant has articulated such a reason, while Plaintiff has not made an adequate showing of retaliatory animus by Defendant.  However, the Court includes this further analysis to make plain that its decision to deny the Motion for Summary Judgment is not changed through the application of the burden-shifting framework.

consistent with the First Circuit's guidance that courts should rely on whether "the evidence as a whole is sufficient to make out a jury question" on the retaliation claim.  Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996).  Defendant has not exposed any gap in the record that renders Plaintiff's retaliation claim unsustainable as a matter of law.  Rather, Defendant has offered a plausible alternative factual narrative.  Thus, the Court concludes that the question of whether the actions of Plaintiff or Defendant caused the termination of Plaintiff's employment is one for the jury.

### B.    Disability Discrimination

For the purposes of summary judgment, Defendant does not dispute Plaintiff's disabled status or her ability to perform the essential functions of her job with reasonable accommodations. Rather, BMA argues that it met its legal obligation to make reasonable accommodations for Coleman's disability.  Defendant's argument on this point, like its arguments regarding the adverse employment action and causation prongs of the retaliation claim, is contingent on disputed issues of material fact.

Defendant asserts that Drouin, on behalf of BMA, told Coleman on November 26, 2013 that BMA would provide all of her requested accommodations.  BMA also points to subsequent correspondence from D'Sanchez to Coleman, such as e-mail messages on December 19, 2013, December 27, 2013, and January 3, 2014, as evidence of its willingness to work with Coleman to address the issues posed by her disability.

Coleman, however, has disputed that Drouin ever told her that the restrictions set forth in the First RTW Note and the Second RTW Note would be accommodated by BMA.  Further, Coleman characterizes the interactive process as compromised by the actions of BMA employees and agents, including AON Hewitt's unresponsiveness and erroneous record-keeping.  The

competing versions and interpretations of the facts propounded by Plaintiff and Defendant present genuine disputed issues of material fact that fall within the province of the jury to ultimately resolve.

Defendant argues that the First Circuit's decision in Equal Employment Opportunity Commission v. Kohl's Department Stores, Inc., 774 F.3d 127 (1st Cir. 2014), sets a high bar for a plaintiff's claim of disability discrimination to survive summary judgment.   In Kohl's, an employee resigned her position during the first meeting between the employee and representatives of the employer to discuss the employee's disability.  Id. at 130-131.  The employee's manager sought to dissuade the employee from resigning immediately following that meeting, and the manager further contacted the employee to offer her the opportunity to resume her employment. Id. at 131.  Under those facts, the court concluded that while "Kohl's response to [employee's] accommodation request may well have been ham-handed . . . we cannot find that its subsequent overtures should be construed as empty gestures."  Id. at 133.  Rather, "[Employee's] refusal to participate in further discussions with Kohl's was not a good-faith effort to participate in an interactive process," and as a consequence, the plaintiff "was primarily responsible for the breakdown in the interactive process."  Id.  Therefore, the plaintiff lacked a basis for arguing that the defendant had failed to meet its legal obligation to make reasonable accommodations. Defendant argues that in this case, as well, Plaintiff voluntarily resigned her employment before the interactive process had time to successfully run its course, and unilaterally rebuffed the good faith attempts of BMA to re-engage with the interactive process.

Defendant's reliance on a factual parallel between Kohl's and this case is misplaced. Viewed in the light most favorable to Plaintiff, the record supports the view that Plaintiff actively engaged with the interactive process over a period of at least five weeks, and that she made a

15

variety of documented efforts to contribute to the interactive process.  On this record, a reasonable jury could further conclude that Defendant failed to participate in the interactive process in good faith, and that these failures went well beyond the "ham-handed" initial response to an accommodation request described in <u>Kohl's</u>.  Defendant has raised potentially relevant considerations that may weigh in favor of the opposing view that it did ultimately participate in the interactive process in good faith.  These considerations are appropriate for the jury to weigh in its final analysis, but are not dispositive in favor of Defendant under the summary judgment standard.

## IV.    CONCLUSION

For the reasons just stated, Defendant's Motion for Summary Judgment (ECF No. 18) is DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 11th day of February, 2016.